AO 91 (Rev. 11/11) Criminal Complaint

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT
## for the
### District of New Mexico

| | |
|---|---|
| United States of America<br>v.<br>**SANTIAGO MARTINEZ**<br>Year of Birth: 1992<br><br>*Defendant(s)* | Case No. 21-MJ-1739 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **November 13, 2021** in the county of **Taos** in the
_____ District of **New Mexico**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1153<br>18 U.S.C. § 1111(a) | Offenses Committed Within Indian Country;<br>Murder |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

*Complainant's signature*

Michelle A. Cobb, Special Agent, FBI
*Printed name and title*

Sworn telephonically and signed electronically.

Date: 11/23/21

City and state: Albuquerque, NM

*Judge's signature*

Steven C. Yarbrough, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE
## ARREST AND CRIMINAL COMPLAINT

I, Michelle A. Cobb, being first duly sworn, hereby depose and state as follows:

### **INTRODUCTION AND AGENT BACKGROUND**

1. This affidavit is made in support of a Probable Cause Arrest and Criminal Complaint for SANTIAGO SUAZO, year of birth 1992.

2. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), and have been since January 2017. I am currently assigned to the Albuquerque Division, Santa Fe Resident Agency. During my employment with the FBI, I have conducted numerous investigations for suspected violations of federal law, including Indian Country crimes and crimes of violence. I have received training on how to conduct complex investigations and I have previously participated in the execution of arrest and search warrants involving federal violations. My investigative training and experience includes, but is not limited to, conducting surveillance, interviewing subjects, targets and witnesses, writing affidavits for and executing search and arrest warrants, managing confidential human sources and cooperating witnesses/defendants, issuing subpoenas, collecting evidence, reviewing electronic devices and analyzing public records.

3. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to law enforcement officers. Law enforcement officers are those federal

and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with cooperating citizen witnesses, whose reliability is established separately herein.

4. Based on my training, experience, and the facts as set forth in this affidavit, I believed there is probable cause that violations of United States Code Title 18 §1153 – Offenses Committed within Indian Country, and §1111(a) – Murder, were committed by SANTIAGO SUAZO.

5. Because this affidavit is submitted for the limited purpose of securing authorization for a Probable Cause Arrest and Criminal Complaint, I have not included each and every fact known to me concerning this investigation. This affidavit is intended to show that there is sufficient probable cause for the requested Probable Cause Arrest and Criminal Complaint.

## PROBABLE CAUSE

6. On November 13, 2021, at approximately 4:53 AM, the FBI Santa Fe Resident Agency (SFRA) was contacted by Taos Pueblo Department of Public Safety (TPDPS) Police Chief Summer Mirabal regarding a deceased Indian female who was found outside her vehicle in front of a residence on Taos Pueblo. The residence was located at 407 Grinding Stone Road, Taos, NM 87571. Chief Mirabal advised the deceased female was JANE DOE (YOB 1992). The residence was occupied by JANE DOE and her boyfriend, SANTIAGO.

7. Chief Mirabal advised SANTIAGO stated he and JANE DOE had been drinking and were listening to music inside JANE DOE's vehicle early in the morning. SANTIAGO

2

stated he went inside the residence to put wood on the fire and when he returned outside, he found JANE DOE laying outside her vehicle unresponsive. Chief Mirabal advised SANTIAGO did not call the police or 911 but instead called members of his and JANE DOE's family to tell them she was gone. Chief Mirabal advised family members called 911 and paramedics arrived on scene. The paramedics placed JANE DOE on a stretcher and into the back of the ambulance. Chief Mirabal drove the ambulance to Holy Cross Hospital while the paramedics worked on JANE DOE in the back of the ambulance. JANE DOE was pronounced dead upon arrival to the hospital.

8. Chief Mirabal advised JANE DOE was covered in significant bruising along her upper shoulder and back on her left side. JANE DOE's gauge style earring appeared to have been ripped out of her right ear lobe and her ear was bloody.

9. Chief Mirabal advised other TPDPS officers and Criminal Investigator (CI) Waylon Brown remained on scene and had secured it. SANTIAGO and various family members were present at the residence and SANTIAGO appeared to be intoxicated.

10. FBI Agents responded to the scene and observed JANE DOE's vehicle, further described as a Green Land Rover Discovery Sport, bearing New Mexico license plate AYTM95, parked in front of the residence's front door. The vehicle was pointed South, in park, and was running with its headlights on. The driver's side door was open approximately 1-2 feet and there appeared to be wet spots on the dirt outside the driver's front and rear doors. FBI Agents photographed the scene and turned the vehicle off. While opening the driver's side door further to turn the vehicle off, FBI Agents saw what appeared to be a dark in color dried red substance near the inside door handle. FBI Agents did not search the interior of the vehicle but did look

through the windows from outside of the vehicle. FBI Agents observed a black in color sling style bag on the passenger floorboard. FBI Agents did not observe any cellular devices nor any empty alcohol containers in the front driver or passenger compartments.

11. An autopsy of JANE DOE was conducted by the New Mexico Office of the Medical Investigator (OMI) on Sunday, November 14, 2021. Preliminary results revealed JANE DOE suffered hematoma on one side of her brain with no skull fracture and no significant bleeding within her skull. She had substantial bleeding between her skull and the skin on the apex of her head indicating a blunt force injury. JANE DOE had small abrasions on the back sides of her hands and abrasions on both knees. Her left side, specifically her chest, shoulder, and arm, had what appeared to be a pattern type injury. There were alternating linear lines within the areas of bruising which could be consistent with a vehicle tire being on her left chest area. OMI advised they would have a pattern expert examine the markings further. JANE DOE had petechiae in her eyelids indicating some sort of force was applied to her chest. The back, top, and middle of JANE DOE's back and shoulder had approximately three softball sized abrasions where her skin was rubbed off. JANE DOE had a bruise on her left thigh, lower back, and bruising around her neck. Her right ear had lacerations, abrasions, and contusions indicating some sort of force was applied and her ear piercing was missing. Additionally, JANE DOE had rib fractures on her right side which may or may not have been caused by cardiopulmonary resuscitation (CPR). JANE DOE's cause and manner of death are still pending and under investigation by OMI.

12. On November 13, 2021, FBI Agents interviewed SANTIAGO outside his residence. SANTIAGO stated he and JANE DOE were at the residence earlier in the day, that

being November 12, 2021. They went grocery shopping and JANE DOE made them dinner. SANTIAGO stated they ate dinner between 5:00 and 6:00 PM and started drinking. That evening and into the morning he and JANE DOE split a 12-pack of 7K IPA beer, a 4-pack of Elevated IPA beer, consumed Tequila shots, and smoked two "bowls" of marijuana. SANTIAGO stated after dinner he played video games and JANE DOE want back to drawing and working on her artwork. At some point they took a break and went outside to listen to music inside JANE DOE's vehicle because there was not a music system inside. SANTIAGO sat in the front passenger seat and JANE DOE sat in the front driver's seat. They continued to consume alcohol inside the vehicle. There was no one else at the residence or in the area.

13. SANTIAGO stated he went inside to put more wood on the fire. SANTIAGO first stated he only went inside for five minutes, then that he went inside for ten minutes. SANTIAGO then stated he was intoxicated and didn't remember how long he was inside. When he came back outside, the vehicle was on and JANE DOE was laying on the ground. SANTIAGO grabbed JANE DOE and tried to wake her up. JANE DOE's lips were blue and her cheeks were purple. SANTIAGO turned the music down in the vehicle. SANTIAGO found JANE DOE like this around 3:30 AM. SANTIAGO stated he called his mom and JANE DOE's sister and did not call the police or 911. SANTIAGO stated he did not call the police or 911 because he wanted to tell JANE DOE's family she was unconscious.

14. SANTIAGO stated when he came outside JANE DOE was laying outside the vehicle with her body towards the front tire. First, SANTIAGO described the tire as just pushing up against JANE DOE's head, on the outside. SANTIAGO then described the tire as being on JANE DOE's arm while she was laying on her back with her arm out. SANTIAGO got inside

5

the vehicle and backed it off from JANE DOE in order to get the tire off her arm. SANTIAGO first stated JANE DOE was behind the front driver's side tire. Agents pointed out that he would have driven further onto JANE DOE's body if he put the vehicle in reverse and backed up, at which time SANTIAGO changed his story and stated JANE DOE was laying in front of the front driver's side tire. SANTIAGO advised JANE DOE was bleeding and he saw bruising on her face but did not know how that happened. SANTIAGO was not sure if the vehicle was in gear when he got inside to back it off from JANE DOE.

15. During the interview with SANTIAGO on November 13, 2021, FBI Agents observed a fresh cut on the pointer finger knuckle of his right hand, as well as abrasions on his outside middle finger and just below his ring and pinky finger knuckles. SANTIAGO stated he was right hand dominant and that he had punched a wall. SANTIAGO also had what appeared to be small abrasions on the palm of his right hand, tops of his left and right forearm, and on his left and right elbows. There was blood on the left outside forearm area of his sweatshirt that he identified as belonging to JANE DOE. SANTIAGO stated the abrasions on his arms, hands, and elbows were from pounding the ground and the blood was from grabbing JANE DOE while she was on the ground. SANTIAGO stated he and JANE DOE did not get into an altercation or an argument and JANE DOE was not trying to leave the residence in her vehicle. SANTIAGO did not know what happened to JANE DOE and there was no one else around. JANE DOE's cell phone was either lying next to her on the ground or was inside her vehicle. At the time of the interview her cell phone was inside the residence.

16. SANTIAGO stated he and JANE DOE had never gotten into a physical altercation. They had been dating for approximately 10 years. SANTIAGO stated there were no

6

issues between them. JANE DOE would get mad at SANTIAGO when he drank too fast, so they drank the same amount. That night, JANE DOE and SANTIAGO were both buzzed. They were picking on each other in a friendly way. SANTIAGO described JANE DOE as talkative and that she would laugh when she drank. SANTIAGO stated they did not get in an argument and while he was inside the residence, he did not hear JANE DOE yell out at all. Prior to SANTIAGO finding JANE DOE, the only injury she had was a twisted ankle from an incident right before Halloween. JANE DOE did not have any other bruising or injuries to her body.

17.   On November 13, 2021, FBI Agents interviewed WITNESS 1 HM (YOB 1965) outside of SANTIAGO's residence. WITNESS 1 stated she was SANTIAGO's mother and that he called her at approximately 3:30 AM stating, "JANE DOE's dead, I can't get her up, she's not breathing." WITNESS 1 drove to SANTIAGO's residence with WITNESS 2 DM (YOB 1962) while keeping him on the phone. WITNESS 1 and WITNESS 2 ran up to where JANE DOE was laying and saw WITNESS 3 JS (YOB 1979) and WITNESS 4 CM (YOB 1983) performing CPR on JANE DOE. WITNESS 1 told WITNESS 4 to call 911. WITNESS 1 stated SANTIAGO told her he was playing video games and JANE DOE was drawing her art before he went to a store to buy cigarettes at Speedway. When SANTIAGO left, JANE DOE began playing video games and listening to music. When he got back, SANTIAGO locked up the car. SANTIAGO told WITNESS 1 that JANE DOE made him dinner and he did not know what happened. WITNESS 1 stated SANTIAGO and JANE DOE argued during their relationship and JANE DOE would ask WITNESS 1 to intervene. That morning, when WITNESS 1 felt JANE DOE's hand, it was cold.

18.     On November 13, 2021, FBI Agents interviewed WITNESS 2, who advised his son, SANTIAGO, called WITNESS 1 at approximately 3:23 AM that morning to say JANE DOE was not waking up. WITNESS 1 called WITNESS 3 and WITNESS 4 and told them to go to SANTIAGO's residence. Either WITNESS 1 or WITNESS 4 called JANE DOE's sister, WITNESS 5 DS (YOB 1989), to come by. When WITNESS 5 showed up, she blamed SANTIAGO for JANE DOE's death. WITNESS 2 stated SANTIAGO told him JANE DOE was listening to music when he went inside to get wood and he did not know what happened to her. WITNESS 2 stated SANTIAGO called WITNESS 1 the evening of November 12, 2021, asking for cigarettes. WITNESS 2 stated SANTIAGO and JANE DOE did not have any domestic problems between them.

19.     On November 13, 2021, FBI Agents interviewed WITNESS 4, who advised her mother, WITNESS 1, called her at approximately 3:48 AM that morning to say SANTIAGO called saying JANE DOE was unresponsive. When WITNESS 4 arrived at SANTIAGO's residence she observed JANE DOE's cheeks to be purple, her tongue was hanging out, her lips appeared to be blue in color, and her ear was bloody. WITNESS 4 and WITNESS 3 performed CPR on JANE DOE. WITNESS 4 checked JANE DOE's airway but there were no signs of life. JANE DOE was warm to the touch and her face was purple in color. JANE DOE smelled of hard alcohol and beer.

20.     WITNESS 4 stated SANTIAGO and JANE DOE has some relationship problems when it was discovered he was sending text messages to another girl. This was sometime in June of 2021. Both SANTIAGO and JANE DOE liked to drink alcohol. SANTIAGO would tend to get aggressive when he drank, and JANE DOE would call WITNESS 4 and WITNESS 1 to calm

8

him down. WITNESS 4 stated SANTIAGO told her JANE DOE's head was by the tire of the vehicle and he could not pull her out until after he moved the car a bit. SANTIAGO told her he started drinking around 5:00 PM the previous night, that being November 12, 2021.

21. On November 13, 2021, FBI Agents interviewed WITNESS 5, who advised she was the sister of JANE DOE. WITNESS 5 stated she heard her cell phone vibrate at approximately 3:40 AM that morning and missed the call. She woke up and received another call at approximately 3:43 AM from WITNESS 1 via SANTIAGO's cell phone. WITNESS 1 stated her first thought was that SANTIAGO and JANE DOE were arguing again. When WITNESS 5 answered, WITNESS 1 was crying hysterically and saying, "She's gone." WITNESS 5 wondered why WITNESS 1 called her and not the police, so she called TPDPS Police Chief Summer Mirabal to notify her. When WITNESS 5 arrived at SANTIAGO's residence she saw WITNESS 1 and WITNESS 2 holding SANTIAGO. WITNESS 5 ran up to JANE DOE and quickly knew she was deceased. WITNESS 3 and WITNESS 4 were performing CPR on her.

22. WITNESS 5 saw blood on one side of JANE DOE's head. WITNESS 5 heard SANTIAGO repeatedly saying, "I pulled her from under the car." SANTIAGO said he did not know why the vehicle was on JANE DOE and that he went inside to get wood prior to coming outside and seeing her "like that." WITNESS 5 stated when the ambulance arrived it couldn't get to JANE DOE because SANTIAGO's vehicle was in the way. SANTIAGO stated he had thrown his keys. Someone found the keys laying somewhere on the ground and they were able to move SANTIAGO's vehicle out of the way. The paramedics loaded up JANE DOE and took her away in the ambulance.

23. WITNESS 5 stated she was suspicious about why JANE DOE would be outside so late in the night or early in the morning as that was not typical of her. She also was suspicious of the blood on JANE DOE's head, bruises on her body, and how her gauge earring was pulled out. WITNESS 5 knew JANE DOE to park her vehicle the opposite direction from how it was parked that morning. WITNESS 5 had never seen JANE DOE park like that. Additionally, the radio was on in JANE DOE's vehicle, which was unusual. JANE DOE would usually connect her cell phone to the vehicle and stream music. She never listened to regular radio. WITNESS 5 stated it looked like JANE DOE was hit on the side of the head and was trying to get away.

24. When SANTIAGO consumed alcohol, he would get hysterical. WITNESS 5 described SANTIAGO and JANE DOE's relationship and toxic. They got into a physical altercation last year around Christmas time during which SANTIAGO had JANE DOE locked in a room, pinned down to the ground, and choked her. WITNESS 1 called WITNESS 5 to tell her about the incident. SANTIAGO's parents, WITNESS 1 and WITNESS 2, were trying to get into the room during the altercation for a period of time and once they finally gained entry they had JANE DOE lock herself in her vehicle away from SANTIAGO. Due to this incident, WITNESS 2 "beat up" SANTIAGO because of the way he treated her. SANTIAGO and JANE DOE broke up for approximately two weeks before getting back together.

25. WITNESS 5 stated SANTIAGO would get upset during family get togethers and leave early. JANE DOE caught SANTIAGO texting another female and confronted him. Typically, SANTIAGO and JANE DOE would drink heavy IPA beers such as 7K IPA.

26. On November 13, 2021, FBI Agents interviewed WITNESS 6 RB (YOB 1990) who advised he was WITNESS 5's boyfriend. WITNESS 6 stated he and WITNESS 5

frequently partied and drank with SANTIAGO and JANE DOE. WITNESS 6 described SANTIAGO as a jealous person who did not handle alcohol well. SANTIAGO and JANE DOE fought a lot when they drank. They had verbal arguments which usually resulted in the end of the party. SANTIAGO would get belligerent and storm off. Sometimes SANTIAGO and JANE DOE would break up and get back together. WITNESS 6 recalled an incident when JANE DOE was trying to leave SANTIAGO's residence and he held her down so she could not leave. SANTIAGO's dad, WITNESS 2, had to beat SANTIAGO to get him to let go of JANE DOE. WITNESS 6 did not think SANTIAGO and JANE DOE were good for each other and advised SANTIAGO was previously caught with photos of other girls on his phone.

27.    WITNESS 6 stated he woke up that morning to WITNESS 5 taking on the phone to WITNESS 1. WITNESS 1 called WITNESS 5 from SANTIAGO's cell phone. WITNESS 1 said JANE DOE was gone. WITNESS 6 and WITNESS 5 drove to SANTIAGO's residence and WITNESS 6 called the police from WITNESS 5's cell phone to tell them about the call from WITNESS 1. After WITNESS 6 saw JANE DOE he told the police they needed an ambulance. When they arrived at SANTIAGO's residence, SANTIAGO, WITNESS 1, WITNESS 2, WITNESS 3, and WITNESS 4 were there. JANE DOE's vehicle was running, the door was open, and the interior light was on. There was no music playing in the vehicle. JANE DOE was laying on the ground next to the driver's side of the vehicle, faced up with her head towards the front of the vehicle. JANE DOE had blood on her face and it was pale. It looked like her gauge earring had been ripped out. WITNESS 3 and WITNESS 4 were giving JANE DOE chest compressions. WITNESS 6 touched JANE DOE and yelled at her to wake up. He checked for a pulse and could not find one. SANTIAGO was grabbing at JANE DOE's face and screaming at her so WITNESS 6 grabbed him and pulled him back.

11

28.     WITNESS 6 stated SANTIAGO told him JANE DOE made dinner for them that night and they were drinking. JANE DOE was working on her artwork. SANTIAGO stated he went inside to put more wood on the fire and when he came back outside JANE DOE was under her vehicle. SANTIAGO stated he had to back up the vehicle to get her out.

29.     On November 15, 2021, an FBI Agent interviewed WITNESS 3, who was the boyfriend of WITNESS 4. WITNESS 3 stated WITNESS 4 received a phone call from WITNESS 1 around 3:30 AM. WITNESS 3 heard WITNESS 4 say, "What, what, what do you mean JANE DOE's gone?" WITNESS 3 and WITNESS 4 were woken up by the call and got to SANTIAGO's residence within a few minutes. WITNESS 4 called 911 on the way there. When WITNESS 3 saw JANE DOE she was blue in the face, her tongue was sticking out, and she was blue. WITNESS 3 stated it was obvious JANE DOE was already gone when they got there. JANE DOE's left arm and shoulder were positioned a little under the vehicle. WITNESS 3 pulled JANE DOE out from under the vehicle and began chest compressions. JANE DOE's thigh was wet and she had already urinated on herself. WITNESS 3 tilted JANE DOE's head back, conducted a few sternal rubs, and continued compressions. WITNESS 3 stated it was obvious that JANE DOE was already deceased, but they continued to work on her until backup arrived.

30.     WITNESS 3 and WITNESS 4 switched off doing compressions. SANTIAGO kept holding JANE DOE's head, crying over her, and rushing back to her while they were working on her. SANTIAGO was finally taken away but kept coming back. WITNESS 3 kept telling the others to get SANTIAGO out of there. The paramedics arrived and immediately picked up JANE DOE and placed her on a stretcher. She was taken into the back of the

12

ambulance and hooked up to the machines. The paramedics were not able to get any readings on JANE DOE as she was already gone. Chief Mirabal drove the ambulance while the paramedics were in the back working on JANE DOE.

31.     WITNESS 3 described JANE DOE's body as flimsy when he pulled her out from underneath the vehicle. She was not stiff, and he was able to move her. JANE DOE did not have a pulse when WITNESS 3 first checked her and she never regained one. Before WITNESS 3 moved her, JANE DOE was laying on her back with the front driver's side tire near her left ear and shoulder. JANE DOE was laying at a slight angle with her left hip under the driver's side door and her feet pointing towards the rear of the vehicle. Her body was approximately 2-3" underneath the vehicle and the tire was just slightly away from her body. The vehicle was turned on and driver's side door was partially open approximately 3-4". WITNESS 3 did not observe anything on the ground around JANE DOE. It did not appear like anyone had tried to move JANE DOE out from underneath the vehicle prior to WITNESS 3 pulling her out.

32.     WITNESS 3 stated SANTIAGO kept yelling out, "What were you doing JANE DOE, what were you doing? How am I going to live without you?" SANTIAGO stated he had been drinking and did not know what happened. He went inside to build a fire and JANE DOE was like that when he came back out. WITNESS 3 heard WITNESS 5 tell SANTIAGO that was "bullshit" and that they always drank. WITNESS 3 advised JANE DOE's vehicle was normally parked in the same area but was usually facing the opposite direction, North. It was unusual that it was facing South. WITNESS 3 stated SANTIAGO and JANE DOE bickered once in a while but overall, they were happy together. They were always together. WITNESS 3 never heard of SANTIAGO or JANE DOE hitting each other. Sometimes SANTIAGO would get out of hand

13

and yell, but JANE DOE was the one who would calm him down. They kept to themselves a lot and went to family functions. WITNESS 3 advised SANTIAGO was messaging another girl a couple of years prior so they broke up for a few days.

33. WITNESS 3 advised SANTIAGO first called WITNESS 5, who did not answer, and then called WITNESS 1. WITNESS 1 and WITNESS 2 went up to SANTIAGO's residence, which was approximately a three-minute drive, and they called WITNESS 4. While at the residence, WITNESS 2 closed the back gate to the driveway entrance so no one else could drive in. WITNESS 3 described the back gate as always being open.

34. On November 19, 2021, search warrants were issued for the searches of both JANE DOE and SANTIAGO's cell phones. The search warrants, associated with Case Numbers 21-MR-1649 and 21-MR-1650, were issued by United States Magistrate Judge, Steven C. Yarbrough. Review of JANE DOE and SANTIAGO's cell phones located the following text messages of interest from November 5, 2021:

   a. 8:11 AM – JANE DOE: "I'm not saying this because I'm mad, I'm saying this because it's how I've been feeling for a long time now. We really need to take time from each other. I'm not in the right place to be in a relationship with you."

   b. 8:21 AM – SANTIAGO: "I'm sorry JANE DOE all I asked was to tie my hair. I'll learn how so you don't have to worry. Not going to argue about this and if you don't want to stay around me then you don't have to."

   c. 8:23 AM – JANE DOE: "Its not about your hair, it's about how we argue or get mad at every little thing. It's not just me but it's also you too. I'm not happy

14

anymore. Even when we try to have fun usually something happens between us, and that reinsurers that I'm not happy."

d. 8:24 AM – SANTIAGO: "I wasn't the one getting mad this morning. We'll if your not happy then"

e. 8:27 AM – JANE DOE: "It's both of our attitudes, when I helped you find your phone you could have said "thank you." Instead you just walked out the house. I need time to work on my priorities, my work and school. Being around you everyday prevents me from doing all of that."

f. 8:35 AM – SANTIAGO: "I know my attitude is bad and I'm going to work better on controlling it. Sorry I didn't say anything cause I was already 20 minutes late. Okay I understand that, if I prevent you then shouldn't be with me."

35. On November 22, 2021, SANTIAGO was interviewed by an FBI Agent, during which he stated he was the one responsible for JANE DOE's death and he was the one who hurt her. It was just SANTIAGO and JANE DOE at the residence. JANE DOE wanted to leave and he did not want her to leave. SANTIAGO was angry and hurt JANE DOE. He took it way too far. SANTIAGO stated he hit and shoved JANE DOE. When SANTIAGO pushed JANE DOE, she fell on the driver's side of the car. SANTIAGO was angry and got in the car and pressed on the gas and hit her. SANTIAGO stated he was mad and furious when he got in the car. He knew it was his fault she was not here. SANTIAGO stated it was an accident, but it happened.

36. SANTIAGO stated JANE DOE was yelling for SANTIAGO to stop and to calm down. JANE DOE kept telling him to go to sleep, and he should have gone to sleep.

15

SANTIAGO stated they were arguing, and he was being foolish and drunk and did not listen to her. He took it way too far. SANTIAGO left her there and went inside his residence and walked around, not wanting to believe what happened, happened. When he went back outside, he found JANE DOE laying by the vehicle. SANTIAGO stated he hit JANE DOE outside the car and it happened outside the driver's side.

37. SANTIAGO stated they got in JANE DOE's vehicle to drink and listen to music. They were sitting a long time talking back and forth, then they started to argue about how things were not going right or how he wanted them to go. JANE DOE told SANTIAGO she did not want to be with him anymore. SANTIAGO went out to the driver's side and they were arguing. SANTIAGO stated things got out of hand and he pushed her. SANTIAGO stated he felt the vehicle hit JANE DOE. He got out and she was still laying there. He did not do anything and was in shock. SANTIAGO went inside his house then went back outside and found her like that. SANTIAGO did not know how long he was away from her. He was not thinking at all and got into the car. He was angry and did not want her to leave. SANTIAGO got out of the driver's side of the vehicle to go inside his residence. While inside, he walked back and forth in shock because of what happened. SANTIAGO went back outside and JANE DOE was laying there and her cheeks were purple. SANTIAGO moved the vehicle from where her arm was, parked it, jumped back out and was holding and kissing her and yelling.

## JURISDICTIONAL STATEMENT

38. The offenses detailed in this affidavit were committed within the exterior boundaries of the Taos Pueblo. JANE DOE and SANTIAGO are enrolled members of Taos Pueblo.

## **CONCLUSION**

39. Based on my training, experience, and the facts set forth in this affidavit, I respectfully submit there is probable cause to believe that violations of United States Code Title 18 §1153 – Offenses Committed within Indian Country, and §1111(a) – Murder, were committed by SANTIAGO MARTINEZ.

40. Supervisory Assistant United States Attorney Kyle T. Nayback reviewed and approved this affidavit for legal sufficiency.

Respectfully submitted,

Michelle A. Cobb
Special Agent
Federal Bureau of Investigation

Sworn telephonically and signed by electronic means on November 23, 2021:

THE HONORABLE STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE

17

Case 1:21-cr-01934-MV   Document 2   Filed 11/23/21   Page 19 of 19