## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                            No. 21-CR-01934 MV

SANTIAGO MARTINEZ,

       Defendant.


### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on the Opposed Motion to Suppress Statement by Santiago Martinez [Doc. 59].  Having carefully considered the briefs, exhibits, and relevant law, and being otherwise fully informed, the Court finds that the Motion is well taken and will be granted.

### BACKGROUND

Mr. Martinez is charged with one count of the unlawful killing of Jane Doe with malice aforethought, in violation of 18 U.S.C. §§ 1153 and 1111. Doc 17. At issue in this opinion is whether Mr. Martinez should have been re-Mirandized prior to his post-polygraph test interview on November 22, 2021. The following represents the Court's findings of fact, based on the evidence submitted by the parties and the testimony presented at an October 26, 2023 hearing.[1]

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. Fed. R. Crim. P. 12(d). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d) purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other rules of evidence, except those with respect to privilege, do not bind the Court. Fed. R. Evid. 104(a).

In the late morning hours of November 13, 2021, Santiago Martinez contacted members of his and Jane Doe's family to "tell them she was gone." Doc. 2 at 4. Family members called 911 and paramedics arrived on the scene at 407 Grinding Stone Road in Taos Pueblo. *Id.* Paramedics placed Jane Doe on a stretcher, and Summer Mirabal, Police Chief of the Taos Pueblo Department of Public Safety, drove the ambulance to Holy Cross Hospital, where Jane Doe was pronounced dead at the scene. *Id.*

At approximately 4:53 a.m., Police Chief Mirabal contacted the FBI Santa Fe Resident Agency regarding Jane Doe, explaining that the deceased had been found outside of her own vehicle in Taos Pueblo. *Id.* at 3. Police Chief Mirabal reported to the FBI that Jane Doe was covered in significant bruising along her upper shoulder and back left side and that her gauge style earring appeared to have been ripped out of her right ear lobe. *Id.* During this time, Mr. Martinez was at the scene with various family members and appeared to be intoxicated. *Id.*

At the scene, Mr. Martinez spoke to Police Chief Mirabal. *Id.* at 2. According to Police Chief Mirabal, Mr. Martinez reported that he and Jane Doe had been drinking and were listening to music inside her vehicle earlier that night. *Id*. He stated that he went inside to put wood on the fire and that, when he returned outside, he found her lying, unresponsive, outside her vehicle. *Id.* at 3. At that point, he called members of his and her families, who then called 911. *Id.* FBI Special Agent Michelle Cobb ("SA Cobb") also spoke with Mr. Martinez outside of the residence; during their conversation, he gave a similar account of the night, and indicated that he would "take a lie detector test." Transcript of October 26, 2023 Hearing ("Hr. Tr.") 29.[2]

---

[2] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

At some point on or before November 18, 2021, SA Cobb requested a polygrapher to administer a polygraph test to Mr. Martinez. *Id.* 79:24-80:16. Because a New Mexico polygrapher was unavailable, Special Agent Donna Coyle ("SA Coyle") was "brought in from New Orleans." *Id.* SA Cobb talked to her and gave her "a summary of the case, [and] discussed any of the evidence that was in the case." *Id.* In an email message dated November 18, 2021, SA Coyle documented that she and SA Cobb "planned to have [Mr. Martinez] come in for a follow up interview on Monday, November 22, 2021 . . . and polygraph him." *Id.* 19-69:2. She further documented that SA Cobb "has requested in writing to have the post test interview recorded." *Id.* Finally, her email noted that she "intend[ed] to record the Miranda consent portion of the pre-test interview according to OGC guidance, stop the recording, and resume the recording in the post test interview." *Id.*

On November 22, 2021, SA Cobb sought out Mr. Martinez on Taos Pueblo and asked if he was willing to answer "some further questions," and indicated that they "had space at the Taos Police Department." *Id.* at 29:18-30:3. Mr. Martinez agreed to this request, and his parents drove him to the Taos Police Department. *Id.* Upon arrival, SA Cobb and another agent took Mr. Martinez and his parents "through a secured door" into an interview room, where they informed Mr. Martinez's parents that they wanted to interview him "one-on-one" and, accordingly, asked them to leave the room. *Id.* at 31:2-14. This conversation was not recorded. *Id.* 59:24-60:1. His parents left the room and remained in the lobby for the duration. *Id.*

Once Mr. Martinez was in the room alone with the agents, SA Cobb turned on a recording device. She began the conversation by telling him that "first off," she "wanted to check on [him] and see how [he was] doing," and that this was "a super traumatic thing that [he was] going through." Transcript of November 22, 2021 SA Cobb Interview ("SA Cobb Int. Tr.") 2:7-9. She

asked him how he was doing, and he responded that he was "not doing that well at all," that he couldn't "sleep" or "eat," and that he kept "crying" because he didn't "know what happened." *Id.* 2:17-4:1. He said that he was "trying deeply hard to remember," but just could not remember what happened. *Id.* Agent Cobb responded that it was "totally [] understandable" that he might not remember, "especially with the trauma [he] was going through at the time," but that she could "see it all over [his] parents' faces" and "on her dad," and that "one of the ways" that they could "clear someone," which they had "talked about [] slightly" was "by taking a lie detector test." *Id.* 5:21-6:7. She told him that by "taking a lie detector test, they could "clear [his] name quickly, and then "the community" would not "look at [him] that way anymore," and that this was "the quickest way for [them] to do it and to clear [his] name and let [his] family have that peace" and "let her family have that peace so that [he could]" say, 'I took a lie detector test, and I passed it. I'm telling the truth.'" *Id.* 6:6-7:2. SA Cobb then said that they "would really like to offer that to [him] right now," and asked whether he would be willing to take a lie detector test. *Id.* 6:10-7:8. Mr. Martinez acquiesced, and at that point, SA Cobb ended the recording. *Id.* 7:6-21. At no time during that conversation (or at any other time) did SA Cobb inform Mr. Martinez that there would also be an interview *after* the polygraph; rather "[a]ll [she] did was offer for him to take the polygraph, and he agreed." Hr. Tr. 43:9-10, 13-14.

SA Cobb then escorted Mr. Martinez to another room where SA Coyle had already set up her polygraph equipment. *Id.* 34:7-17. The room was a small, private "interview room" that had a one-way mirror through which SA Cobb observed the entirety of the interaction between SA Coyle and Mr. Martinez. *Id.* 43:18-20, 44:14. The door to the interview room was closed for the duration of the time that SA Coyle and Mr. Martinez remained there. *Id.* 85:10-11. SA Coyle advised Mr. Martinez that he was not in custody, that he was free to leave, and that he could stop answering

questions at any time. *Id.* 85:12-25. SA Coyle gave Mr. Martinez a form entitled, "Consent to Interview with Polygraph," along with another form entitled, "Advice of Rights," which provided a standard *Miranda* warning.[3] Hr. Tr. 51:13-16. Neither form mentioned any possibility of a post-polygraph interview. Hr. Tr.108:24-109:8. Mr. Martinez signed, on a computer, the Advice of Rights form at 10:36 a.m. and the Consent to Interview with Polygraph one minute later at 10:37 a.m. Doc. 59, Exhibits A and B. SA Coyle recorded "the Miranda consent portion of the pre-test interview." Hr. Tr. 68:11-69:17. During the recorded "Miranda consent portion," SA Coyle did not mention the possibility of a post-test interview.

After Mr. Martinez signed the two forms, SA Coyle turned off the recorder and began a pre-test interview of Mr. Martinez, which lasted between one and one-half and two hours.  *Id.* 61:13-62:14; 88:10-12. SA Coyle testified that as a general matter, during the pre-test interview, she provides "an overview" of the polygraph test process, talks about "the topics that are going to be tested," and indicates that they will "talk based on what information comes out of the charts." *Id.* 78:20-79:3. In this instance, she "asked some basic administrative type questions," "discussed the incident with him to . . . find out his side of things," and "discussed all of the questions that were going to be asked on the test."  *Id.* 89:8-14. SA Coyle described the pre-test interview as "engaging in conversation." *Id.* 89:25. Mr. Martinez was offered, and took, a bathroom break at the end of the pre-test interview. *Id.* 91:13-15.

---

[3] The form stated as follows:

> Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

SA Coyle could not "remember the exact words," but testified that she "make[s] it a habit of saying something to the effect of, you know, if you're not doing well on the test or there's some areas that are concerning, we will discuss that," and is "certain" that she did so in this case. *Id.* 79:9-12; 91:13. She testified that this would have happened during the unrecorded pre-test interview, after Mr. Martinez had already signed the "Advice of Rights" form, but she did not recall exactly what she might have said in this case. *Id.* 110:11-24. SA Cobb (who observed the entirety of the pre-test interview, polygraph test, and post-polygraph interview) testified that she did not know whether SA Coyle told Mr. Martinez at any point that there would be an interview after the polygraph. *Id.* 49:8-10.

After the pre-test interview, SA Coyle administered the polygraph test. The test, which SA Coyle described as the "running of the charts," took between 30 minutes and one hour. *Id.* 65:11-12; 91:20-21; 92:9-10. During the polygraph examination, SA Coyle administered two sets of questions to Mr. Martinez. *Id.* 53:24-53:1; 92:11-13; 1145-8. During the first set of questions, SA Coyle asked, "Did you do anything to harm Jane Doe that night?" and "Did you participate in harming Jane Doe that night?" Doc. 59 at 2; Hr. Tr. 114:9-11. The test result showed "inconclusive" as to whether Mr. Martinez was truthful when he responded to those questions. Hr. Tr. 53:2-4; 116:5-7. SA Coyle then modified her questions for the second set, asking instead, "Did you do anything to injure Jane Doe that night?" and "Did you participate in injuring Jane Doe that night?" Doc. 59 at 2; Hr. Tr. 114:12-15. The test result showed "deception" as to whether Mr. Martinez was truthful when he responded to those questions. Doc. 59 at 2; Hr. Tr. 53:5-6; 116:8-9.

SA Coyle testified that she did not record the pre-test interview or the polygraph test of Mr. Martinez, as SA Cobb had not requested such recordings, and as it was not FBI "policy to

allow [either the pre-test interview or the polygraph test] to be recorded." Hr. Tr. 69:10-17; 89:13-18; 91:22-24. SA Coyle thus was "not authorized to record those." *Id.* 95:17-19. FBI policy did, however, allow her to record her post-test interview of Mr. Martinez and, as noted above, SA Cobb had requested in advance that such interview be recorded. *Id.* 68:19-69:3.

Immediately upon completion of the polygraph examination, SA Coyle turned on the recorder and, once she removed the polygraph equipment from Mr. Martinez, stated, "[I]t's completely clear that you weren't being honest with me today. Okay? And I think you already know that." Transcript of SA Coyle November 22, 2021 Interview ("SA Coyle Int. Tr.") 3:3–5. She then told him that he "didn't pass the test today," and said, "[s]o what we need to talk about is what happened to DeAnna. Okay? We need to talk about it." *Id.* 3:5-8. SA Coyle "could tell he was uncomfortable," and observed that he "look[ed] a little scared." *Id.* 118:1-2. She did not offer him a break to use the bathroom or eat something but rather launched into her questioning. Hr. Tr. 55:10, 58:13-15; 93:13-15. SA Coyle reiterated at the hearing that she "didn't tell him he could leave," and told him, "We need to talk about what happened." *Id.* 117:7-10. Neither before she began the post-test interview nor at any point thereafter did SA Coyle advise Mr. Martinez that he was free to leave, that he was entitled to an attorney, or that he did not have to speak to her. *Id.* 57:6-14. SA Coyle testified that she did not choose to re-Mirandize him because "[n]othing had changed." *Id.* 95:20-25. Later in her testimony, she characterized the "pre-test and the running of the charts and the post tests" as "all one thing. That's the polygraph." *Id.* 142:8-11.

The post-polygraph interview lasted for approximately three hours. *Id.* 117:21. During that three-hour period, SA Coyle engaged in questioning that was, as described by SA Cobb, at times "highly accusatory" and had "characteristics of an interrogation." *Id.* 46:9, 18-19. On 28 instances during the post-polygraph interrogation, Mr. Martinez explained that he did not remember the

events of the evening or did not remember the events that SA Coyle described.[4] In response to Mr.

Martinez's statements that he did not recall the events of the night past a certain point, SA Coyle

pushed back, repeatedly saying, "I know that you want that to be true, but it's not." *See, e.g.,* SA

Coyle Int. Tr. 7:11-13. As the interview went on, SA Coyle began to lay out detailed scenarios.

For example, when Mr. Martinez stated that he didn't remember arguing with Jane Doe, SA Coyle

responded: "Well, . . . that doesn't make any sense to me—okay—because if you weren't arguing,

then nothing would have happened right?" *Id.* at 16:3-6. When Mr. Martinez assented, SA Coyle

continued: "Nothing would have happened if you weren't arguing. So you were arguing. You were

arguing about the future, things coming up." *Id.* 16:3-6. She asked if their relationship was headed

for a breakup. When Mr. Martinez responded "No, no," she responded, "I think it was. I think it

was." *Id.* 22:14-16.

　　　　As Mr. Martinez continued to tell SA Coyle that he did not remember the events of the

evening she proposed her own set of facts:

---

[4] "I don't remember. All I remember is us being in the car," SA Coyle Int. Tr. 14:24-25; "I don't remember getting mad," *Id.* at 15:25; "I don't remember doing that," *Id.* at 15:25-16:1; "I'm not sure. I don't know," *Id.* at 16:11-12; "I keep thinking, and I don't know," *Id.* at 19:13-14; "Not that I remember," *Id.* at 22:1; "[I]t's just not coming to me. And I keep repeating it [in] my head." *Id.* at 29:14-15; "I don't know," *Id.* at 33:6; "I don't know. I don't remember arguing. I don't—I just remember us being in the car together," *Id.* at 33:17-19; "I don't know, I don't remember," *Id.* at 34:8-9; "[I]t's just that it's not coming to me. Like, I don't know. I'm trying. I'm really trying," *Id.* at 34:12-14; "I don't know," *Id.* at 35:9;"I'm—I'm trying to remember what we were doing or what happened," *Id.* at 36:4-6; "I'm at a loss of what—what happened," *Id.* at 36:11-12; "I still don't know," *Id.* at 39:12; "I don't know what that next step took—or where it took us because it's . . . lost. And I'm trying to figure it out," *Id.* at 40:23-41:1; "I don't remember. I'm trying to remember," *Id.* at 41:5-6; "I don't remember," *Id.* at 44:1-2; "I don't remember even hitting her or—hitting her with the car. I don't know," *Id.* at 44:2-4; "I just don't know. I—I wouldn't hit her, though," *Id.* at 51:4-5; "It's in there. It's just I—it hasn't come yet," *Id.* at 52:22-23; "I just don't know how it happened," *Id.* at 53:1-2; "I don't remember us arguing, "*Id.* at 53:11; "I'm trying to remember," *Id.* at 56:11; "I'm telling you what I know and remember," *Id.* at 57:23; "I'm sure it's going to come back to me, but just now it's—it's not," *Id.* at 65:7-8; "It's just that it'll come out, but I—I—I know it's in there. It's in the memory," *Id.* at 65:18-20; "I'm telling you what I remember," *Id.* at 71:9-10.

Q: But something happened—something happened that night—okay—either in that—in your house or in the car or in between. And the conversation was not going well. The relationship was in turmoil, and there was probably yelling and screaming and hands flying all over the place. And—and then things got really out of control. It just went terribly out of control because if they didn't get out of control, she would be here. And, you know, maybe—maybe you hit her a little too hard. You didn't realize you hit her so hard and then—and then panic, "I didn't mean to hit her so hard."

A: I don't know. Thinking about it, like, I loved her so much. I wouldn't hit her.

Q: I know. But she was—she was pulling away from you. She was finally, like, you know, "I—I've had enough. I've had enough. I've had enough." And she didn't want to be there anymore. And—and what do you do? You know, how—how do you repair that, right? And, you know, the alcohol in you and, you know, having no sleep, it was, you know, what, 3:00 in the morning? You're just so, so angry.

A: I don't know. I don't remember arguing. I don't—I just remember us being in the car together. And I keep thinking—

Q: It was that conversation. It was—it was talking about the future. And you wanted one thing, she wants something else. And—and you want her back in. Okay? And—and that condition that you were in, the only thing you could think of was physically trying to make her do something.

A: I didn't—

Q: Making that—making that situation stop. You just wanted it to stop, stop fighting, stop yelling.

A: Stop drinking.

Q: Stop drinking.

A: I don't know. I don't remember.

Q: But you do remember. You do remember. It's---it's there. Is it a little hazy?

A: It must be, but it's just that it's not coming to me. Like, I don't know. I'm trying. I'm really trying.

*Id.* at 32:17-34:14.

SA Coyle rejected or resisted Mr. Martinez's accounts of the night and pushed him to fill

in any gaps in his recollection:

A: I'm at a loss of what—what happened. And I'm going to tell them. If they don't believe me, then—

Q: They're—they're not.

9

*Id.* at 36:10-14.

Repeatedly, SA Coyle asserted that Mr. Martinez recalled more than he was

telling her.

> A: I don't remember. I'm trying to remember. Just being together. I loved her. We
> did everything together, and I don't know how—how far it went. Or I know how
> far it went, but it—
>
> Q: You know. You know how far it went.

*Id.* at 41:5-10.

SA Coyle pressed Mr. Martinez to make a full confession despite the professed gaps in his

memory, telling him, "You've got to—you've got to just take the responsibility." *Id.* at 52:3-4.

When he continued to tell her that he didn't remember the events as she described them, she told

him, "So I want to make you get past that. And—and if you—if you keep sitting in here and saying,

"I don't—I don't remember," when I know you do, it—it's—it's not going to do you any justice."

*Id.* at 52:18-21.

The facts to which Mr. Martinez eventually assented were largely laid out and proposed by

SA Coyle, with Mr. Martinez explicitly stating that he did not remember them occurring, as in the

following exchanges:

> A: But I just don't know how it happened.
>
> Q: Okay. But—but you—
>
> A: It was—
>
> Q: But you know that you were in the vehicle. Okay?
>
> A: With her.
>
> Q: And—and you probably started arguing. Okay? So teel me about—tell me
> about the arguing.

A: I don't remember us arguing.

Q: Did—did arguing start in the house?

A: No. It—it must—it didn't happen in the house because we were outside and—

Q: So was she, um—was she trying to leave? Because, um, you know, that would infuriate anyone, right? You have this great relationship. Um, yeah, it's rocky, but it's there, and you're there together. But then something tips the scales, and she wants to leave. And then you feel like that is—that she's going to leave for good. She's—she's getting ready to go to California. You're going to lose her forever.

*Id.* at 53:1-54:1.

Q: Uh, but you can't remember the argument you had? That—that—

A: No.

Q: It—we're—I'm—I'm past that. Okay. I'm past that. I see right through you. I—I see right through you. Okay?

*Id.* at 5:14-19.

In addition to suggesting how the events of the night might have transpired, SA Coyle

tried to get Mr. Martinez to admit to jealousy and tension in his relationship.

Q: [S]he was in the limelight, right? And you weren't.

A: I didn't—I didn't mind that though.

Q: I think you—

A: I don't need—

Q: I think you did mind it. I think you did mind it.

A: It was me.

Q: And she was getting ready to go to California, and you didn't need to go.

A: I wanted to go, but I couldn't go because of my job.

Q: Uh-huh.

A: I wanted to go with her, and she—

11

Q: Was she rubbing it in your face?

A: No. She wanted me to go with her.

*Id.* at 61:11-62:4.

When Mr. Martinez explained that he "must have done it," SA Coyle persisted in her questioning and responded, "Don't bullshit me anymore," and "I don't want to hear that crap." *Id.* 71:2-3, 70:8-9. She stated that she knew he "harmed [Jane Doe]." *Id.* 18:12-14. When she was not satisfied with Mr. Martinez's answers, she responded, "You're completely bullshitting," and told him, "I need you to… fill in those blanks about how…you harmed her and how all this stuff happened." *Id.* 71:5-6, 18:14-16.

Ultimately, SA Coyle elicited incriminating statements from Mr. Martinez. First, he stated: "Okay I'll take responsibility. I told myself that. I pray to her, give me a sign, something. If I hurt you, then I—I will take responsibility I told her that in my head and my prayers. I have to do that. I'm going to do that. I'll tell [her family]." *Id.* 37:7–12. In response to SA Coyle saying that accidents happen, Mr. Martinez then stated, "Yeah it was--it had to be. I wouldn't have done this intentionally to . . . physically kill her." *Id.* at 40:7–10. A bit later, Mr. Martinez said, "[I]t's my fault because of the way I—I acted. And the end result of that is now she's gone and it's because of what I must have done to her . . . I hurt her . . . so bad that I couldn't even get her back and it's my fault. It's my fault." *Id.* at 58:22–59:4. Finally, the following exchange occurred:

A: We got in her car.  We were sitting in there for a long time, talking back and forth. And that's when we started to argue about how things weren't going right or how it – we wanted to – how I wanted it to. We started arguing, and I must have switched seats or I went out to the other side, onto the driver's side. We were arguing. Things got out of hand. I – I pushed her got on her side, accidentally pressed on the – on the gas, and I hit her.

Q: And you, um –

A: Yeah, the bump or I felt her.

Q: You – you felt – okay. You felt – felt a bump and felt that she was under the car?

A: Yeah. And I got out. She was still laying there. I didn't do anything. I was in shock. I didn't want to believe what [had] just happened.

*Id*. 82:16-83:8.

After eliciting these statements, and after almost three hours of post-test questioning, SA Coyle offered Mr. Martinez water and something to eat, and asked whether he needed a bathroom break. *Id.* 89:24-90:24. After she "sort of tended to his needs," she told him that she needed "to take a break for just a second" and advised him that she would be right back. *Id.* 99:6-7; 91:17-19. When she asked if he needed anything, he asked, "Just when will I be able to go or—" *Id.* 91:25-92:1. SA Coyle interrupted his question and did not answer him, but rather said, "let me just talk to the case agent real quick," and left the room. *Id.* 92:2-3.

When she returned to the room, SA Coyle told Mr. Martinez, "[W]hat I would like to do, um, is um, you know, give you the opportunity to write down in your own words, um – uh, what you told me about what happened Okay?" *Id.* 93:5-9. Initially, Mr. Martinez responded, "Okay." *Id.* 93:8. But after SA Coyle asked whether he wanted to use a paper and pen or a computer to write his statement, he asked, "Do I have to do that now?" *Id.* 94:20. SA Coyle responded, "Um, I'd like you to, yeah." *Id.* 94:20-21. Mr. Martinez again asked, "Can I do it later, or do I have to do it now?" *Id.* 95:9-10. SA Coyle responded, "Um, well, because I – I've got to get going . . . but I did want to give you that opportunity to – to write a statement. Um, are you – are you okay doing that? Would you – would you like to do that?" *Id.* 95:14-17. Mr. Martinez continued to answer in the negative, stating, "Not – not yet, actually. . . I don't want to do it now." *Id.* 95:18. SA Coyle continued to press him, stating, "Well, let me let you think about it. . . so if you would like to, I can leave you alone. I'll give you some time to – to think about it . . . and you can write what you

13

want to write. Okay? I'll give you a couple minutes." *Id.* 96:3-15. Mr. Martinez answered, "I'd rather just wait on it because I don't want to do it now." *Id.* 96:16-17. SA Coyle rejected this answer, saying, "Okay. But I'm going to give you at least a couple minutes just to think." *Id.* 96:18-20. Mr. Martinez then asked, "What's going to happen now, or what do I do?" *Id.* 97:8-9. SA Coyle again insisted, "I want to give you a couple minutes just to think about . . .whether or not you want to write something down." *Id.* 97:10-12. SA Coyle advised Mr. Martinez that she was going to "talk to the case agent real quick," and then they would "come and talk to [him]," and left the room. *Id.* 97:13-18.

SA Coyle returned to the room (without the case agent), and asked, "Did you think about the, uh – the statement or whatever? You don't want to write something down?" *Id.* 97:23-25. Mr. Martinez again answered, "No," and said, "I just want to be with my parents." *Id.* 98:1-4. SA Coyle did not respond to this, but instead made the following statement:

> Um, so, um, I'll just close this. Um, so far as the, um you know, the actual polygraph – because, uh, that was all I did here today was do the polygraph for you. . . so far as the polygraph is concerned, um – uh, what I do is I just package up, um, what we did, you know, all of the checks and things we ran . . . Um, so I'm going to close this out and then, um – and that's it for the polygraph.

*Id.* 98:5-19. She then advised Mr. Martinez that she was going to have the case agent "come in" so that he could "have a chat with her." *Id.* 98:20-21. At that point, she stopped recording and left the room for the last time, leaving Mr. Martinez behind. *Id.* 98:25-99:3.

SA Cobb then entered the room (alone), handcuffed Mr. Martinez, and placed him under arrest. Hr. Tr. 37:21-38:6. SA Cobb testified that, when she "first went into the room," she told him that he was being "placed under arrest," and instructed him "to turn around" so that she could handcuff him. *Id.* 38:4-6.   According to SA Cobb's testimony, Mr. Martinez "seemed very shocked," as he "thought he was going home." *Id.* 38:6-7. The arrest process was not recorded. *Id.*

59:20-23. Mr. Martinez was arrested approximately six hours after first entering the interview room where SA Coyle was waiting for him that morning. *Id.* 51:7-11.

On December 21, 2021, Mr. Martinez was charged by Indictment with one count of the unlawful killing of Jane Doe with malice aforethought in violation of 18 U.S.C. §§ 1153 and 1111. Doc. 17. He pled not guilty at an arraignment held on December 30, 2021. Doc. 21. On March 1, 2023, he filed the instant Motion to Suppress, in which he asks the Court to suppress the content of the post-test interview conducted after completion of the polygraph test on November 22, 2021. Doc. 59. In support of his Motion, Mr. Martinez argues that the interview was a custodial interrogation, and that he did not knowingly and voluntarily waive his rights as to that custodial interrogation. *Id.* On March 15, 2023, the government filed a response in opposition, arguing that Mr. Martinez was not in custody at the point of his post-test interview and, that, even assuming that he was in custody, his earlier *Miranda* waiver applied to the post-test interview. Doc. 62. Mr. Martinez filed a reply on March 31, 2023. Doc. 70. On October 26, 2023, the Court held an evidentiary hearing on Mr. Martinez's motion, where it heard testimony from Mr. Martinez's mother Helena Martinez, SA Cobb, and SA Coyle.

## DISCUSSION

Mr. Martinez's Motion to Suppress raises two questions: whether the post-test interview was a custodial interrogation and, if so, whether Mr. Martinez knowingly and voluntarily waived his Fifth Amendment rights as to that custodial interrogation. For the reasons explained below, the Court finds that the post-test interview was a custodial interrogation, and that Mr. Martinez did not knowingly and voluntarily waive his Fifth Amendment protections for the purposes of that interrogation. The Court further finds that the consequent violation of his Fifth Amendment rights requires suppression of the content of the post-test interview.

15

## I.      Mr. Martinez Was in Custody During His Post-Test Interview.

In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements . . . stemming from custodial interrogation of a suspect unless . . . [p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966).  Of course, "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008); *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A suspect is in custody when he has been "deprived of [his] freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "Two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). The Court appl[ies] an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id.* (citation omitted).

"The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993).  The Tenth Circuit "avoid[s] hard line rules and instead allow[s] several non-exhaustive factors to

guide" this determination. *United States v. Jones*, 523 F.3d 1235,1240 (10th Cir. 2018).  Those

factors are defined in *Jones* as follows:

> First, we consider the extent to which the suspect is made aware that he or she is
> free to refrain from answering questions or to end the interview at will.  Second,
> we look at the nature of questioning, where prolonged accusatory questioning is
> likely to create a coercive environment from which an individual would not feel
> free to leave.  Finally, by using the following helpful guideposts, we check whether
> police dominate the encounter: Separation of the suspect from family or colleagues
> who could offer moral support; isolation in nonpublic questioning rooms;
> threatening presence of several officers; display of a weapon by an officer; physical
> contact with the subject; and an officer's use of language or tone of voice in a
> manner implying that compliance with the request might be compelled.

*Id.* (cleaned up).  Whether a defendant is allowed to leave after an interrogation may also be

considered in this analysis.  *See United States v. Laurezo*, No. CR 18-3413, 2019 WL 2453822,

at *5 (D.N.M. June 12, 2019).

Applying the *Jones* factors and considering the circumstances surrounding the post-test

interview, the Court finds that a reasonable person in Mr. Martinez's position would not have felt

at liberty to terminate the interview and leave; accordingly, Mr. Martinez was subject to a custodial

interrogation.

First, while Mr. Martinez had been advised that he was free to leave and could stop

answering questions *in the context of SA Coyle obtaining his consent to be interviewed with a

polygraph test*, no such advisements were offered when, three hours later, the polygraph test ended,

and SA Coyle's tone became accusatory.  To the contrary, SA Coyle told him in no uncertain terms

that he was not being honest with her and conveyed that because he did not "pass the test," he had

no choice but to continue answering her questions, stating: "[W]e need to talk about [] what

happened to DeAnna. Okay? We need to talk about it." That he had no choice but to stay was

underscored by the fact that, although she knew that he was "scared," SA Coyle did not offer him

any opportunity to leave the room at this point (or any point thereafter), either for the bathroom,

for food, or to see his parents – even when he told her that going to his parents was all he wanted to do. And when he repeatedly told her that he did not want to write a statement, rather than accept that and let him go, she told him that she would leave him in the room alone "to give [him] a couple of minutes just to think." In fact, SA Coyle did not offer Mr. Martinez water, food, or a bathroom break until she completed her questioning, which was approximately four hours after his only trip to the bathroom, and almost six hours after their interaction began that morning.

Indeed, the interview transcript makes clear that Mr. Martinez believed that he was *not*, in fact, free to leave or end the interview. At one point, when SA Coyle asked whether he needed anything, Mr. Martinez asked, "Just when will I be able to go?" Mr. Martinez again asked SA Coyle, "What's going to happen now, or what do I do?" He also indicated that he "just want[ed] to see [his] parents." If Mr. Martinez had felt free to leave, he would not have needed to ask when he would be able to go, what was going to happen, or what he *had* to do, but instead would have just walked away and gone to his parents, as he desired to do.[5] Given the mandatory nature of SA Coyle's language, coupled with her lack of any advisement that he was free to leave or stop answering questions, a reasonable person in Mr. Martinez's position equally would have believed that, although he had been at liberty to leave before he allegedly failed the polygraph test, once he failed the test, he was no longer at liberty to do so.

Next, SA Coyle engaged in precisely the sort of "prolonged accusatory questioning" that the Tenth Circuit has found likely to create a coercive environment from which an individual would not feel free to leave. *Jones*, 523 F.3d at 1240; *see also Griffin*, 7 F.3d at 1519 (finding that

---

[5] SA Cobb's testimony that, when she arrested him, Mr. Martinez "seemed very shocked," as he "thought he was going home," does not change this analysis. The arrest process was not recorded and, regardless of how he appeared in that moment, his recorded statements make clear that during SA Coyle's post-test interview of him, he did not feel free to leave.

officers created a coercive environment where they asked case-specific questions and "continued even after it was obvious the defendant was incriminated, and only after a full and complete confession. . . did the police properly advise the defendant"). As noted above, as soon as she turned on the recorder and removed the polygraph equipment from Mr. Martinez, SA Coyle announced that he had not been honest with her. From there, she launched into questioning that, as described by SA Cobb, was at times "highly accusatory" and had "characteristics of an interrogation." On the 28 instances described above, Mr. Martinez explained that he did not remember the events of the evening or did not remember the events that SA Coyle described. In response to Mr. Martinez's statements that he did not recall the events of the night past a certain point, SA Coyle pushed back, repeatedly saying, "I know that you want that to be true, but it's not," that she "want[ed] to make him get past that," that she was "past that," and that she saw "right through" him.

As detailed above, rather than accept his reiterations that he did not remember what happened, SA Coyle laid out detailed scenarios and proposed her own facts to "make sense" of what happened. She repeatedly rejected and resisted Mr. Martinez's accounts of the night and pushed him to fill in any gaps in his recollection. SA Coyle pressed Mr. Martinez to make a full confession despite the professed gaps in his memory. The facts to which Mr. Martinez eventually assented were largely laid out and proposed by SA Coyle, with Mr. Martinez explicitly stating that he did not remember them occurring. SA Coyle also tried to get Mr. Martinez to admit to jealousy and tension in his relationship. When Mr. Martinez admitted that he "must have done it," SA Coyle persisted in her questioning and responded, "Don't bullshit me anymore," and "I don't want to hear that crap." She stated that she knew he "harmed [Jane Doe]." When she was not satisfied with Mr. Martinez's answers, she responded, "You're completely bullshitting," and told him, "I need you to… fill in those blanks about how…you harmed her and how all this stuff happened." SA

Coyle's unrelentingly aggressive and accusatory questioning created a coercive environment from which an individual would not feel free to leave. *See Sprosty v. Buchler*, 79 F.3d 635, 643 (7th Cir. 1996) (finding that defendant was in custody where officers engaged in prolonged and persistent questioning to get defendant to lead them to incriminating evidence).

Finally, several factors indicate that law enforcement dominated the encounter. First, Mr. Martinez was asked to come to the Taos Police Department to be questioned. Once there, he was escorted to an area of the police station that was off-limits to the public, behind a secured door. After a short time, he was separated from his parents, and was not permitted to see them for the duration of the interview. The interview itself took place in small, private room with a one-way mirror.

Most strikingly, SA Coyle's refusal to take "I don't remember" for an answer and use of aggressive, accusatory language and tone of voice implied that compliance with her requests for an explanation for Jane Doe's death was compelled. As discussed above, SA Coyle would not accept his repeated (and consistent) statements that he did not remember what happened on the night of Jane Doe's death, but rather told him that she intended to "make him get past that," and pushed him to admit what she intimated she already knew.

SA Coyle equally implied that compliance with her "offer" for him to prepare a written statement was compelled. When Mr. Martinez asked if he had to write a statement "now," SA Coyle responded, "I'd like you to, yeah." When he asked whether he could do it later, rather than tell him that he was free to go, she responded that she would "leave [him] alone," and "give [him] some time to…think about it." When Mr. Martinez stated categorically that he did not want to write a statement, saying "I'd rather just wait on it because I don't want to do it now," she did not accept that answer, but rather indicated that she was going to "give [him] at least a couple minutes

just to think." Apparently realizing that SA Coyle was not going to let him leave because he was not complying with her "request" for a written statement, Mr. Martinez asked, "What's going to happen now, or what do I do?" SA Coyle again told him "just to think about" whether he wanted to write something down and left the room, giving him no indication that he, too, could leave. Upon her return, Mr. Martinez reiterated that he did not want to write a statement but "just want[ed] to be with [his] parents." SA Coyle ignored this statement and advised him that she was going to "close" out the polygraph and have the case agent come in to "chat" with him.

Finally, Mr. Martinez was not allowed to leave after the interrogation. *Laurezo*, 2019 WL 2453822, at *5 (finding that the refusal to allow an individual to leave after the interrogation is indicative that the individual had been in custody during the interrogation). To the contrary, after SA Coyle could not convince Mr. Martinez to write a statement, SA Cobb entered the room, handcuffed Mr. Martinez, and placed him under arrest.

In summary, the totality of the circumstances demonstrates that Mr. Martinez was in custody during the post-test interview, and that SA Coyle's questioning amounted to an interrogation. After the conclusion of the polygraph test, Mr. Martinez was never told that he was free to leave, that he was entitled to an attorney, or that he could refuse to answer questions. He was subjected to a prolonged, accusatory interrogation that created a coercive environment. He was separated from his family in an interrogation room restricted to the public. SA Coyle dominated the interaction, berating him, refusing to accept his answers, and conveying that compliance with her requests for a confession and a written statement were compelled. When, after several hours, he was unequivocal that he did not want to write a statement, but rather wanted to be with his parents, SA Cobb handcuffed him and placed him under arrest. Based on these circumstances, the Court finds that a reasonable person in Mr. Martinez's situation would not have

felt at liberty to terminate the post-test interview and leave; accordingly, Mr. Martinez was subject to a custodial interrogation.

## II.   Mr. Martinez Did Not Waive His *Miranda* Rights in Connection with the Post-Test Interview.

Under *Miranda,* "a confession obtained during a 'custodial interrogation' may not be used by the prosecution against the defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination." *Chee*, 514 F.3d at 1112. The Supreme Court has held that a person being interrogated in custody must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda,* 384 U.S. at 444. These warnings are required any time an individual is subject to custodial interrogation. *Id.*

An individual may waive *Miranda* rights, but any such waiver of the Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (citations omitted). An express statement of waiver is not required; rather, the waiver can be inferred from the defendant's actions and words. See *United States v. Nelson*, 450 F.3d 1201, 1211 (10th Cir. 2006) (citation omitted). "Whether this standard is met depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Burson*, 531 F.3d at 1256 (citations omitted). The government generally bears the burden of proving a valid waiver by a preponderance of the evidence. *See id.* at 1256; *United States v. Nelson*, 450 F.3d at 1210-11. A waiver is knowing and intelligent if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Here, it is undisputed that Mr. Martinez signed an "Advice of Rights" form prior to the polygraph test. It is also undisputed that Mr. Martinez did not waive his *Miranda* rights a second time, after the polygraph test was completed but before (or during) SA Coyle's post-test questioning. Because the Court has concluded that the post-test interview was a custodial interrogation, Mr. Martinez was constitutionally entitled to receive *Miranda* warnings prior to that interview.  The question before the Court thus is whether, by signing the Advice of Rights form prior to the polygraph test, Mr. Martinez knowingly and intelligently waived his *Miranda* rights for purposes of the post-test interview.

In *Wyrick v. Fields*, the Supreme Court rejected any *per se* rule that a suspect who was given *Miranda* warnings *before* administration of a polygraph test does – or does not – need to be advised of his rights again *after* the test is completed but before any post-test interview is conducted.  459 U.S 42, 49 (1982). Rather, the Court made clear that "the totality of circumstances is controlling" and that the scope of pre-polygraph test waivers depends on the facts specific to each case. *Id.* at 48. In particular*,* the court must consider whether "the circumstances changed so seriously that [a defendant's] answers no longer were voluntary, or unless he no longer was making a knowing and intelligent relinquishment or abandonment of his rights." *Id.* at 47 (citation omitted).

In the case before it, the Supreme Court reversed the Eighth Circuit's decision to suppress the content of the relevant post-polygraph interview, noting that the defendant had "appeared voluntarily and stated that he did not want counsel present during the interrogation." *Id.* at 46. Further, the defendant had been the one who requested the polygraph examination and was already represented by counsel at the time. *Id.* at 43–44. The Court concluded that, under these circumstances, "the questions put to [the defendant] after the examination would not have caused

him to forget the rights of which he had been advised and which he had understood moments before." *Id.* at 49.

Circuit courts have applied the *Wyrick* totality of the circumstances test to determine that a *Miranda* waiver secured prior to a polygraph test did not constitute a valid waiver of the right to counsel for purposes of a post-test custodial interrogation. *See United States v. Leon-Delfis*, 203 F.3d 103 (1st Cir. 2000); *United States v. Gillyard*, 726 F.2d 1426 (9th Cir. 1984); *but see United States v. Eagle Elk*, 711 F.2d 80, 81–82 (8th Cir. 1983) (finding pre-polygraph test waiver extended to post-test questioning where defendant had requested polygraph test in the first instance and was accompanied by counsel). For example, in *Gillyard*, after a polygraph examiner had interviewed the defendant, two postal inspectors informed the defendant that he had failed the polygraph exam and proceeded to question him for two and a half hours, eventually securing a confession. 726 F.2d at 1428. The Court emphasized that the post-test questioning was performed by someone other than the original polygraph operator and that the officers came into the room accusing the defendant of lying, and proceeded to "go to work" to get a confession. *Id.* at 1429. This shift in tone to accusatory questioning, the Court explained, weighed in favor of suppression. *Id.* The Court also noted that the defendant was not represented by counsel. *Id.* Importantly, the Court distinguished the facts before it from those before the Court in *Wyrick*, noting that, while the defendant in *Wyrick* had actively requested the polygraph test, the defendant before it had only consented to such a test, and that, while the detailed warning given in *Wyrick* "made it clear to the defendant that he was not merely taking a polygraph examination but was going to be asked questions about a specific offense under investigation," the defendant before it was given only a standard Miranda warning to sign. *Id.* at 1429.

In *Leon-Delfis*, the Court similarly distinguished the facts from those in *Wyrick*, noting that the defendant before it, who had limited experience with the criminal justice system, had not initiated the post-polygraph discussion, and that the waivers that the defendant had signed before the polygraph test did not "specifically mention the possibility of post-polygraph questioning." 203 F.3d at 111-12. Based on the circumstances, the Court explained that "[i]t does not follow that [the defendant] waived his right to counsel for post-test questioning because he waived his right to pre-test and test questioning: waivers of rights are specific." *Id.* at 112 (citations omitted).

The Third Circuit's reasoning in *United States v. Johnson* is also instructive. 816 F.2d 918 (1987).  In that case, the Court did not find it necessary to rule on whether the scope of a pre-polygraph test waiver extended to post-test questioning, but nonetheless wrote in detail to explain its "concern about the scope of [the defendant]'s initial waiver" since "he believed he was submitting merely to an examination and not to any post-examination interrogation." *Id.* at 921 n.4. The factors that the Court identified as "most significant" to the analysis were "whether the suspect has consulted with counsel, whether the suspect has requested the examination, and whether the waiver form initially presented to the suspect clearly indicates that post-examination questioning is a possibility." *Id.*

Under the totality of the circumstances analysis required by *Wyrick*, the Court finds that, by signing the Advice of Rights form *prior* to the polygraph test, Mr. Martinez did not knowingly and intelligently relinquish his rights in connection with the post-test interview.

First, Mr. Martinez was "a young man who had no previous exposure to the criminal justice system." *Johnson*, 816 F.2d at 921 n.4. He was not represented by counsel and had never even consulted with an attorney. Because he was "uncounseled," he "cannot be presumed to have received competent legal advice which clarified any ambiguities concerning the examination." *Id.*

Next, it is undisputed that at no point prior to signing the Advice of Rights form was Mr. Martinez advised, either orally or in writing, "that post-examination questioning [was] a possibility." *Id.* During his initial interview with SA Cobb at the Taos Police Department, SA Cobb appeared to sympathize with Mr. Martinez's trauma. Indicating that it was "totally [] understandable" that he might not remember what happened, while also implying that she could "see [] all over the faces" of his parents and Jane Doe's parents that they suspected him of causing her death, she explained that "taking a lie detector test" was the "quickest way" for him to "clear [his] name," so that "the community" would not "look at [him] that way anymore." She then offered him the opportunity to take a lie detector test "right now." Mr. Martinez agreed to take the test. Despite having previously "requested in writing" that SA Coyle record her post-test interview of Mr. Martinez, SA Cobb did not mention to Mr. Martinez the possibility of a post-test interview; rather "[a]ll [she] did was offer for him to take the polygraph, and he agreed."

Immediately after he agreed to take the polygraph test, SA Cobb escorted him to the room where SA Coyle was waiting with the polygraph equipment ready to go. Upon his entry into the room, SA Coyle began the "Miranda consent portion" of their conversation, providing him simultaneously with an Advice of Rights form and a Consent to Interview with Polygraph form. Mr. Martinez signed both forms within one minute of each other. During the recorded "Miranda consent portion" of their conversation, SA Coyle did not mention the possibility of a post-test interview, despite having documented that SA Cobb had specifically requested that she record her post-test interview of Mr. Martinez.

Unlike the warnings given in *Wyrick* and *Eagle Elk*, the waiver forms provided to Mr. Martinez failed to "make it clear [] that he was not merely taking a polygraph examination but was going to be asked questions about a specific offense under investigation." *Gillyard*, 726 F.2d at

1429. Like the standard *Miranda* warnings given in *Gillyard* and *Leon-Delfis*, the Advice of Rights form and the Consent to Interview with Polygraph form given to Mr. Martinez for his digital signature did not "specifically mention the possibility of post-polygraph questioning" – a possibility of which both SA Cobb and SA Coyle were aware. *Leon-Delfis*, 203 F.3d at 111-12.

Accordingly, the circumstances surrounding Mr. Martinez's *Miranda* waiver were this: SA Cobb had just offered Mr. Martinez the opportunity to take a polygraph test as a *quick* way to clear his name; Mr. Martinez walked into a room where polygraph testing equipment was already set up; SA Coyle handed him a standard Advice of Rights form along with another form that, by its very title, indicated that it applied to a polygraph test; and no one had advised him orally or in writing that the agents planned for him to be questioned after completion of the polygraph test. It is only logical that, given these circumstances, Mr. Martinez "believed he was submitting merely to an examination and not to any post-examination interrogation." *Johnson*, 816 F.2d at 921 n.4. "[W]aivers of rights are specific," and it "does not follow" from the circumstances here that Mr. Martinez "waived his right to counsel for post-test questioning because he waived his right to pre-test and test questioning." *Leon-Delfis*, 203 F.3d at 112.

Admittedly, SA Coyle testified that, although she cannot remember her exact words, and although she did not record it, she is "certain" that she advised Mr. Martinez "something to the effect of, you know, if you're not doing well on the test or there's some areas that are concerning, we will discuss that." By her own testimony, however, any such advisement was given only *after* Mr. Martinez had already signed the Advice of Rights form. Accordingly, SA Coyle's testimony that she mentioned the possibility of further discussion *at some point after she concluded the "Miranda consent portion" of the pre-test conversation and turned off the recorder* does not

change the Court's analysis as to whether Mr. Martinez's waiver contemplated a post-test interview.

The evidence also demonstrates that it was Mr. Martinez who first raised the possibility of taking a lie detector test when SA Cobb initially interviewed him on November 13, 2021. However, there is no similar evidence that Mr. Martinez pursed that possibility, contacted SA Cobb about it, or took any other concrete steps to make it happen. SA Cobb, however, did take such concrete steps, requesting a polygrapher to administer a polygraph test to Mr. Martinez. SA Coyle was then "brought in from New Orleans" to administer the test. SA Cobb discussed the instant case with SA Coyle, and the two agents set the date of November 22, 2021 – unbeknownst to Mr. Martinez – to have Mr. Martinez come in for a follow up interview and submit to a polygraph test.

In accordance with that plan, on November 22, 2021, SA Cobb sought out Mr. Martinez on Taos Pueblo and asked him to come to the Taos Police Department where, again unbeknownst to Mr. Martinez, SA Coyle was already setting up her polygraph equipment. Once at the station and alone in the room with Mr. Martinez, SA Cobb brought up the subject of a lie detector test, which she said, they had "talked about[] slightly." After explaining that a lie detector test was "the quickest way" to prove to his family and his community that he was "telling the truth," SA Cobb specifically asked for Mr. Martinez's consent to take a lie detector test. It was only after he consented to take such a test that she escorted him to the room where SA Coyle and her polygraph equipment were waiting.

Thus, while Mr. Martinez initially raised the notion of a lie detector test, it was law enforcement that orchestrated the actual plan for Mr. Martinez to be polygraphed on November 22, 2021. And it was in accordance with that plan that Mr. Martinez ultimately submitted to a polygraph test that day. Indeed, SA Cobb herself believed that she needed to obtain Mr. Martinez's

consent before the polygraph test was administered to him; if the polygraph test had been his own idea, such consent would have been superfluous. Under these circumstances, the Court cannot conclude that Mr. Martinez's November 13, 2021 offer to take a lie detector test tips the balance toward finding that his *Miranda* waiver applied to the post-test questioning to which he was ultimately subject.

And, while Mr. Martinez may have been the first to raise the possibility of a polygraph test, he undisputedly was not the one who initiated the post-test interview. To the contrary, SA Coyle gave him no opportunity to end the encounter once the polygraph test was completed. Instead, as soon as she removed the polygraph equipment from him, she told him that he was not being honest with her, and as a result, they "need[ed] to talk about [] what happened to DeAnna." This factor thus militates in favor of finding that Mr. Martinez's waiver did not encompass the interview that ensued after the polygraph test ended. *See Leon-Delfis*, 203 F.3d at 111-12. Indeed, as the post-test questioning did not begin until three hours after Mr. Martinez effectuated his waiver, this is simply not the situation in *Wyrick* where the Court found that "the questions put to [the defendant] after the examination would not have caused him to forget the rights of which he had been advised and which he had understood *moments before*." 459 U.S. at 49 (emphasis added).

Finally, while the same person (SA Coyle) administered the polygraph test and conducted the post-test interview of Mr. Martinez, immediately upon removing the polygraph equipment from Mr. Martinez, SA Coyle "announced that [Mr. Martinez] was lying, and proceeded . . . to 'go to work' to get a confession." *Gillyard*, 726 F.2d at 1429. Although SA Coyle did not literally switch places with another agent, she effectively switched her role from that of neutral test administrator to an interrogator whose goal was to "make [him] get past" his inability to remember the events surrounding Jane Doe's death. The evidence reveals that SA Coyle's post-test

"questioning was not merely a continuation of the polygraph examination but a change to accusatory questioning." *Id.*

During the pre-test interview, SA Coyle had, as she described it, merely "engaged in conversation" with Mr. Martinez. And during the polygraph test, as she described it, she had been merely "running the charts." Once the test was completed however, she made clear that after viewing the results, she believed that he was responsible for harming Jane Doe. She turned on a recording device that had been off for the duration of the polygraph test and told him that he had not passed the test. She employed mandatory language conveying that, because he had not passed the test, he had no choice but to continue answering her questions, stating: "[W]e need to talk about [] what happened to DeAnna. Okay? We need to talk about it."  From there, she launched into questioning that, as described by SA Cobb, was at times "highly accusatory" and had "characteristics of an interrogation." As cited above, Mr. Martinez explained at least 28 times that he did not remember the events of the evening or did not remember the events that SA Coyle described. In response to Mr. Martinez's statements that he did not recall the events of the night past a certain point, SA Coyle pushed back, repeatedly saying, "I know that you want that to be true, but it's not," that she "want[ed] to make him get past that," that she was "past that," and that she saw "right through" him.

As detailed above, rather than accept his reiterations that he did not remember what happened, SA Coyle laid out detailed scenarios and proposed her own facts to "make sense" of what happened. She repeatedly rejected and resisted Mr. Martinez's accounts of the night and pushed him to fill in any gaps in his recollection. SA Coyle pressed Mr. Martinez to make a full confession despite the professed gaps in his memory. The facts to which Mr. Martinez eventually assented were largely laid out and proposed by SA Coyle, with Mr. Martinez explicitly stating that

30

he did not remember them occurring. SA Coyle also tried to get Mr. Martinez to admit to jealousy and tension in his relationship. When Mr. Martinez admitted that he "must have done it," SA Coyle persisted in her questioning and responded, "Don't bullshit me anymore," and "I don't want to hear that crap." She stated that she knew he "harmed [Jane Doe]." When she was not satisfied with Mr. Martinez's answers, she responded, "You're completely bullshitting," and told him, "I need you to… fill in those blanks about how…you harmed her and how all this stuff happened."

Accordingly, Mr. Martinez went from taking an agreed-upon polygraph test for the explicit purpose of "clear[ing] his name quickly" to being aggressively interrogated for over three hours about the death of his long-time girlfriend. While he had explicitly consented and waived his Miranda rights with respect to the polygraph test, Mr. Martinez would have been acutely aware that his circumstances had changed after he failed to pass the test. SA Coyle knew as well, as she "could tell he was uncomfortable," and observed that "he look[ed] a little scared." Rather than tell him that he was free to go or ask for an attorney, she told him not to "bullshit" her and that he "needed" to talk. Thus, in contrast with SA Coyle's perception that "[n]othing had changed" that would require her to renew Mr. Martinez's *Miranda* rights, the Court finds that the moment SA Coyle's unrelentingly aggressive and accusatory post-test questioning of Mr. Martinez began, "the circumstances changed so seriously that [Mr. Martinez's] answers no longer were voluntary, [and he] no longer was making a knowing and intelligent relinquishment or abandonment of his rights." *Wyrick*, 459 U.S. at 47.

SA Coyle's characterization of the pre-test interview, the polygraph test itself, and the post-test interview as "all one thing" does not change this conclusion. At the completion of her questioning of Mr. Martinez (seemingly apropos of nothing and after Mr. Martinez told him that he wanted to be with his parents) SA Coyle said, "all I did here today was do the polygraph for

you." Similarly, during the hearing, SA Coyle characterized the "pre-test and the running of the charts and the post-tests" as "all one thing. That's the polygraph." But this characterization is belied by the fact that not only SA Cobb and SA Coyle individually, but also the FBI as an institution, distinguish between the pre-test interview and the polygraph test, on the one hand, and the post-test interview, on the other hand. Specifically, SA Cobb requested in advance and in writing that SA Coyle record only the post-test interview of Mr. Martinez. SA Coyle then requested authorization to record the "Miranda consent portion" of the pre-test conversation and the post-test interview. Indeed, SA Coyle testified that while FBI policy prohibits the recording of the pre-test interview and the polygraph test, it allows for agents to record post-test interviews. Given the different treatment afforded to pre-test interviews and polygraph tests, on the one hand, and post-test interviews, on the other hand, it defies logic to suggest that the three are "all one thing."

In summary, the totality of the circumstances demonstrates that, by signing the Advice of Rights form prior to the polygraph test, Mr. Martinez did not knowingly and intelligently relinquish his rights in connection with the post-test interview. Mr. Martinez was young, had no previous exposure to the criminal justice system, and waived his rights without the benefit of legal counsel.  Prior to signing the waiver, neither SA Cobb nor SA Coyle shared with him their intention to subject him to a post-test interview and, based on the circumstances surrounding his signing of the waiver, it was only logical that he believed he was submitting to a polygraph test alone. Although Mr. Martinez had previously offered to take a lie detector test, SA Cobb, without advising Mr. Martinez, arranged for him to be polygraphed and interviewed on November 22, 2021, and specifically sought his consent to be polygraphed that day. SA Coyle, rather than Mr. Martinez, was the one who initiated the post-test interview. Rather than merely engaging in a continuation of the polygraph examination, as soon as that examination was completed, SA Coyle

changed tactics and began a barrage of aggressive and accusatory questioning. The circumstances thus "changed so seriously that [Mr. Martinez's] answers no longer were voluntary, [and he] no longer was making a knowing and intelligent relinquishment or abandonment of his rights." *Wyrick*, 459 U.S. at 47.

Because Mr. Martinez's waiver thus did not extend to the post-test interview and because, as determined above, the post-test interview constituted a custodial interrogation, Mr. Martinez was constitutionally entitled to a new advisement of his *Miranda* rights prior to the post-test interview. However, neither SA Coyle, nor any other law enforcement officer, provided Mr. Martinez with such renewed warnings. Accordingly, the post-test interview was conducted in violation of Mr. Martinez's Fifth Amendment rights and, as a result, the content of the post-test interview, and all statements made by Mr. Martinez therein, must be suppressed.

## CONCLUSION

For the foregoing reasons, the Court finds that Mr. Martinez's Fifth Amendment rights were violated when SA Coyle initiated a post-polygraph test custodial interrogation as to which Mr. Martinez had not made a knowing and voluntary waiver of his rights. Accordingly, the Court will suppress the content of that post-polygraph test interrogation.

**IT IS THEREFORE ORDERED** that the Opposed Motion to Suppress Statement by Santiago Martinez [Doc. 59] is **GRANTED.**


Dated this 30th day of November 2023.


_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE